**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | |
|---|---|
| STATE OF DELAWARE, | ) |
| | ) |
| v. | ) |
| | ) I.D. # 2401004981 |
| MICHELLE CLIFTON, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Submitted: June 7, 2024
Decided: June 27, 2024

*Upon Defendant's Motion to Suppress – **GRANTED.***

## I.    INTRODUCTION

In early January 2024, Wilmington Police received information from a "past proven and reliable" confidential source ("CS"), that a woman known as "Missy" is a drug dealer who carries a firearm.  The CS provided an address where Missy lives and that she drives a white van with expired registration.  The CS also stated that Missy's two sons, Dwayne and Kelly, live at the same address and Kelly carries a firearm.  Police detectives identified "Missy" as Defendant Michelle Clifton ("Clifton") who resides at the address stated by the CS.

On January 11, 2024, Wilmington Police were surveilling Clifton's residence when they observed Clifton leave her home with three other people, get into a white van with expired registration, and drive away.  Police followed the van and a few blocks later police executed a traffic stop for the expired registration.  Clifton

1

consented to a search of the vehicle and her purse, which contained a small amount of suspected heroin/fentanyl and a digital scale.

The same day as the traffic stop, the officers applied for and obtained a search warrant to search Clifton's residence. In his probable cause affidavit, Detective William Martin ("Det. Martin") included information provided by the CS and stated that "[t]hrough [his] training and experience it is common for drug dealers to only carry enough drugs on them to complete a sale and to keep the majority of it in a residence to avoid having it seized by law enforcement."[1]

The search of the home resulted in seizure of suspected heroin/fentanyl, a firearm, and ammunition.

Clifton filed a Motion to Suppress[2] (the "Motion"), seeking to exclude the evidence seized from her home, arguing there is insufficient factual information to support probable cause to establish a nexus to her residence and that the barebones CS information was not sufficiently verified.

The State argues that the police sufficiently verified the CS tip by conducting their own "independent surveillance and investigation and were able to verify and corroborate almost every detail."[3]

---

[1] D.I. 16, Ex. A, at ¶ 1.B.
[2] D.I. 16.
[3] D.I. 22, at ¶19.

2

The probable cause affidavit was deficient in several respects. It contained a conclusory statement of the CS' past proven reliability; the information provided by the CS did not contain any information linking the alleged drug dealing to the residence; and, it otherwise failed to contain a factual basis to establish a nexus to the residence and the alleged illegal activity. Accordingly, Clifton carried her burden to show that the search warrant lacked probable cause and therefore, the Motion is GRANTED.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Because the Court's analysis is limited to the four-corners of the affidavit, the following facts are derived solely from the warrant application and probable cause affidavit, which was attached as Exhibit A to the Motion.[4]

Det. Martin, a sworn member of the Wilmington Police Department with seven years of police experience, relayed the following facts in his probable cause affidavit:

During the second week of January 2024, Detective H. Cuadrado received information from "a past proven and reliable confidential source" in reference to a female known as "Missy", who resides at 2703 N Pine Street, Wilmington, Delaware (the "Residence").[5] The CS went on to advise that "Missy is a drug dealer and carries

---

[4] D.I. 16, Ex. A.
[5] *Id.* at ¶ 1.A.

3

a firearm."[6]  According to the CS, Missy lives at the Residence with her sons Dwayne and Kelly, who "also carries a firearm."[7]  Finally, the CS advised that Clifton "utilizes a white in color van with an expired registration."[8]

Police identified "Missy" through a DELJIS inquiry as Clifton, who resides at the Residence.[9]  The DELJIS inquiry also revealed that Clifton has a prior felony conviction for fraud.[10]

A DELJIS inquiry identified: (i) "Dwayne" as Dwayne Clifton, who has a prior felony conviction for burglary and who was wanted in connection with two outstanding warrants for burglary and resisting arrest;[11] (ii) "Kelly" as Kelly Clifton;[12] and that they both lived at the Residence.

On January 11, 2024, Det. Martin and assisting officers conducted surveillance on the Residence.[13]  Det. Gibson observed a black female exit the front door of the residence and enter a white Chrysler Town and Country with three other subjects.[14]  A NCIC inquiry showed that the vehicle had not been registered since

---

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.* at ¶ 1.B.
[14] *Id.*

4

2022.[15] Police followed the van for a few blocks and then conducted a traffic stop based on the expired registration.[16]

Clifton, who was driving the vehicle, was removed from the vehicle.[17] Clifton consented to a search of the vehicle and her purse.[18] In the purse was one bundle of suspected heroin/fentanyl (approximately 13 bags, approximately 0.091 grams) stamped "Kiss" and one loose bag (approximately .007 grams) of suspected heroin/fentanyl stamped "Team Number 1," and a black digital scale.[19]

During the stop, "Jimmy Waters[20] spontaneously uttered that his nephew, (Dwayne Clifton …), was in possession of a firearm. Waters did not provide any further details."[21]

Det. Martin also states in the affidavit that "[t]hrough [his] training and experience it is common for drug dealers to only carry enough drugs on them to complete a sale and to keep the majority of it in a residence to avoid having it seized by law enforcement."[22]

---

[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] The affidavit does not provide any further information on Mr. Waters.
[21] D.I. 16 at ¶ 1.B.
[22] *Id.*

Paragraph 2 of the affidavit provides a list of drug traffickers' behaviors, based on Det. Martin's training and experience. The list of A through H, identifies behaviors such as: placing assets in names other than the dealer's own name; maintaining large amounts U.S. currency; secreting records of drug transactions in locations in their residence; utilizing banks and business fronts to attempt to legitimize their profits; maintaining associates' contact information in books or papers; taking payment in stolen items such as TVs; having unexplained wealth; and transporting only "enough drugs that they will need for a sale" and maintaining "the other drugs at a secure location, including but not limited to their residence."[23]

Based on the affidavit, police applied for a search warrant on January 11, 2024, to search the Residence for any heroin or related drug paraphernalia, indicia of occupancy, books and records relating to transporting or selling drugs, books and records relating to transferring or laundering money, currency over $100 in close proximity to any heroin or multiples of VCRs or camera equipment, firearms, and any electronic devices, including cell phones, "used in furtherance of the distribution of illegal drugs."[24]

The warrant was issued, and a search of the Residence resulted in the seizure of two plastic bags of suspected heroin/fentanyl, containing 2.9g and 1.9g of the

---

[23] *Id.* at ¶ 2, H.
[24] *Id.*

substance; 5 bundles of suspected heroin/fentanyl (.455g) stamped "Team #1"; 2 bundles of suspected heroin/fentanyl, stamped "Kiss" (.132g); Delaware identification for Clifton's brother; a firearm; and 43 .25 caliber bullets.

Clifton was indicted on the following charges: (i) drug dealing, (ii) drug possession, (iii) possession, purchase, ownership, or control of a firearm by a person prohibited, (iv) possession, purchase, ownership, or control of ammunition by a person prohibited, (v) possession of a firearm by a person prohibited, (vi) possession of a firearm during the commission of a felony, (vii) conspiracy second degree, and (viii) possession of drug paraphernalia.

The Court held oral argument on the Motion on June 7, 2024, during which the parties presented argument. Other than the warrant application and affidavit, no evidence was presented.

## III. THE PARTIES' CONTENTIONS

### A. *The Motion*

Clifton argues that the probable cause affidavit is conclusory, relies on generic statements regarding the detective's general knowledge about drug traffickers, and lacks a sufficient nexus to permit a finding that the Residence contained contraband. Further, Clifton argues that the affidavit does not: (i) show that the CS had first-hand information, (ii) detail the alleged drug dealing, or (iii) contain facts to suggest that Clifton kept drugs at the Residence.

**B.** *The State's response*

The State argues that the officers sufficiently verified the tip from the past proven reliable CS by conducting their own surveillance and investigation, which allowed them to verify and corroborate almost every detail. The State further contends the officers had probable cause to believe that they would find illegal drugs and firearms in Clifton's residence and that the issuing magistrate's probable cause determination should be given great deference. Therefore, as the State posits, when considering the totality of the circumstances, the magistrate had a substantial basis to conclude that probable cause existed to search the residence and the search warrant was legally sufficient.

## IV. STANDARD OF REVIEW

A defendant may move to suppress evidence under Superior Court Criminal Rules 41(f) and 12(b)(3). "It is well-settled that the Court must employ a 'four-corners' test to determine whether an application for a warrant demonstrates probable cause."[25] Under this test, a reviewing court must determine whether the supporting affidavit "set[s] forth sufficient facts on its face for a judicial officer to form a reasonable belief that an offense has been committed and that seizable

---

[25] *State v. Sisson*, 883 A.2d 868, 876 (Del. Super. 2005), *aff'd* 903 A.2d 288 (Del. 2006) (citing *Pierson v. State*, 338 A.2d 571, 573 (Del. 1975)); *State v. Cannon*, 2007 WL 1849022, at *3 (Del. Super. June 27, 2007) ("The face of the affidavit must present adequate facts to allow a reasonable person to conclude that an offense has been committed and that seizable property would be found in a particular place or on a particular person.").

property would be found in a particular place."[26] "Delaware courts … require that the affidavit contain specific factual information adequate to support probable cause to search a residence."[27]

The initial reviewing judicial officer is owed "great deference."[28] Notwithstanding this deference, the court's "'substantial basis' review requires [that it] determine whether 'the warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances....'"[29]

To successfully challenge the validity of a search warrant, a defendant must prove by a preponderance of the evidence that the search was unlawful.[30] Any evidence obtained from an illegal search or seizure must be excluded from trial.[31]

## V. ANALYSIS

### A. *The test for a probable cause affidavit*

The Fourth Amendment of the United States Constitution and Article I, Section 6, of the Delaware Constitution, protect against unreasonable searches and

---

[26] *Sisson*, 883 A.2d at 876 (internal quotation marks and citation omitted).
[27] *Cannon*, 2007 WL 1849022, at *4.
[28] *State v. Holmes*, 2023 WL 3991641, at *2 (Del. Super. June 13, 2023) (citations omitted).
[29] *LeGrande v. State*, 947 A.2d 1103, 1108 (Del. 2008).
[30] *State v. Chaffier*, 2023 WL 1872284, at *2 (Del. Super. Jan. 17, 2023); *Cannon*, 2007 WL 1849022, at *2 (citations omitted).
[31] *Jones v. State*, 745 A.2d 856, 872-73 (Del. 1999).

seizures.[32]  Under the United States and Delaware Constitutions, a search warrant may be issued only upon the showing of probable cause.[33]

"An affidavit in support of a search warrant must, within the four-corners of the affidavit, set forth facts adequate for a judicial officer to form a reasonable belief that an offense has been committed and the property to be seized will be found in a particular place."[34]  In determining whether probable cause exists to obtain a search warrant, Delaware courts apply a "totality of the circumstances" test.[35]  Where a warrant application is based on an informant's tip, the court must scrutinize "the reliability or veracity of the informant, the basis of the informant's knowledge, and 'the degree to which the tip is corroborated by independent police surveillance and information.'"[36]  "If an informant's tip is sufficiently corroborated by independent police work, the tip may form the basis for probable cause even though nothing is known about the informant's credibility."[37]

"Unlike an arrest warrant, a search warrant is not directed at a person, but rather at the particular place where police have probable cause to believe that

---

[32] *Pollard v. State*, 284 A.3d 41, 45 (Del. 2022).

[33] U.S. Const. amend. IV; Del. Const. art. I, § 6; *Fink v. State*, 817 A.2d 781, 786 (Del. 2003).

[34] *Sisson v. State*, 903 A.2d 288, 296 (Del. 2006).

[35] *Id.*

[36] *Valentine v. State*, 207 A.3d 566, 572 (Del. 2019) (citing *Brown v. State*, 897 A.2d 748, 715 (Del. 2006); *Holden v. State*, 60 A.3d 1110, 1114 (Del. 2013); and *LeGrande*, 947 A.2d at 1108).

[37] *LeGrande*, 947 A.2d at 1108 (citing *Hubbard v. State*, 782 A.2d 264, 2001 WL 1089664, at *4 (Del. Sept. 5, 2001) (Table); *McAllister v. State*, 807 A.2d 1119, 1124 (Del. 2002)).

evidence is located."[38]  "Probable cause to search depends upon the existence of a logical nexus between the items sought and the place to be searched."[39]  "[T]he factual showing necessary to establish probable cause to search a residence is two-fold: first, there must be probable cause that a crime was committed, and second, there must be probable cause to believe that evidence of such crime can be found at the residence."[40]

## B.    *Information provided by the CS*

"It is now settled that the assessment of informants' tips must take into account the reliability or veracity of the informant, the basis of the informant's knowledge, and 'the degree to which the tip is corroborated by independent police surveillance and information.'"[41]  When the affidavit contains conclusory statements regarding the informant's past reliability, "it interferes with the issuing magistrate's ability to make an independent determination regarding the informant's reliability."[42]

Here, the affidavit stated in conclusory terms that the CS was "past proven and reliable."  It provided no further information from which a reviewing magistrate

---

[38] *Cannon*, 2007 WL 1849022, at *4.

[39] *Id.* (citations omitted) ("Requiring this nexus upholds the probable cause requirements of the Federal and State constitutions and properly maintains the distinction between probable cause to arrest and probable cause to search.").

[40] *Id.* (citations omitted).

[41] *Valentine*, 207 A.3d at 572 (citation omitted).

[42] *Id.* (citation omitted).

could make an independent determination of the reliability of the information provided by the CS.

The State argues that the CS' reliability was shown by police corroboration through the independent investigation. Specifically, the police corroborated that Clifton lives at the Residence with her sons and that she drives a white van with expired tags. This information, however, is not evidence of criminal activity. The police did not corroborate the tip that Clifton carries a firearm or that Kelly carries a firearm. To the extent any criminal activity was corroborated, Clifton was found to possess a small amount of drugs at the time of the traffic stop. This is insufficient to establish the CS' credibility.[43]

The basis of the informant's information "can be highly relevant in determining the value of his report.'"[44] Here, Det. Martin's affidavit does not disclose how the CS learned that Missy is a drug dealer and carries a gun (was it based on first-hand knowledge?); how fresh or stale the CS' information was; the nature of the CS' relationship to Clifton; or whether the CS had ever been in the

---

[43] *See id.* (detectives' affidavit, which contained no information about the manner in which the informant had proved to be reliable in the past, such as, detailing whether their prior tips had shown to be accurate or led to arrests or convictions, was found to be insufficient to establish the informant's credibility).
[44] *Id.* at 573.

Residence.[45] "Thus, there is nothing in the substance of the tip itself that sheds light on the purported basis of the informant's knowledge."[46]

Lack of detail of how the informant came about the information can be excused in circumstances where "'sufficient detail [is provided so] that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation.'"[47] Here, the affidavit provides no such detail. The CS did not provide a description of the type of drugs Clifton allegedly sold, the amount of drugs she allegedly possessed, or the type of firearm she allegedly carried. Indeed, the affidavit didn't even relate her alleged drug dealing activity with the Residence. Thus, the affidavit does not contain any self-verifying detail.

## C. *Other indicia of reliability*

The CS' tips are not sufficient to support a finding of probable cause. However, Det. Martin's affidavit contains additional information. Thus, the Court must determine whether there "were there other indicia of reliability providing a substantial basis for the magistrate's conclusion that probable cause existed?"[48]

---

[45] *See id.* at 573-74.
[46] *Id.* at 574.
[47] *Id.* (citation omitted).
[48] *Id.*

The affidavit provides no other factual basis to relate the alleged drug dealing to Clifton or the Residence. Rather, the affidavit contains generic statements of how drug dealers behave. The State admitted that of the eight listed behaviors in paragraph 2, only one could possibly relate to Clifton: "drug traffickers only transport enough drugs that they will need for the sale. They will maintain the other drugs at a secured location, *including but not limited to their residence*."[49] In essence, the affidavit establishes that drug dealers keep drugs places other than on or about their person. This fails to provide any nexus between the alleged drug activity and the Residence.[50] Permitting a warrant that lacks fact-based connection between the alleged illegal activity and the subject's residence "risks licensing 'virtually automatic searches of residences of persons arrested for narcotics offenses.'"[51]

\* \* \*

The CS' reliability has not been shown through the affidavit, either by examples of past proven reliability or specific details of the illegal activity. Further, the affidavit lacks a fact-based connection between the illegal activity and the

---

[49] D.I. 16, Ex. A, ¶ 2, H (emphasis added).

[50] The affidavit also fails to present sufficient facts to form a reasonable belief that Clifton was a drug dealer. While the affidavit identifies the drugs seized through the traffic stop, there are no facts in the affidavit indicating that the amount of drugs in her possession was indicative of drug dealing, as opposed to a personal use amount, for example.

[51] *Cannon*, 2007 WL 1849022, at \*4 (citation omitted).

14

Residence. Considering the totality of the circumstances, as the Court must, Clifton has carried her burden to show that the search warrant did not provide sufficient facts to form a reasonable belief that an offense had been committed and that evidence of such criminal activity would be found at the Residence.

This finding is consistent with the rulings in *State v. Cannon*,[52] *LeGrande v. State*,[53] and *Valentine v. State*.[54]

In *Cannon*, informants told police that Cannon was selling large quantities of drugs and provided specific street locations of such activity. The informants also provided an address for Cannon, identified the car he drove, and stated that he carried a firearm. After police corroborated Cannon's address and that the car was registered in his name, they conducted surveillance at Cannon's home.[55] Police watched Cannon leave his residence and make a stop, where others got into his car for a few minutes. In another stop, Cannon got into a silver car for a few minutes. After Cannon returned to his car, police stopped the silver car. The driver reported having received cocaine from Cannon.[56]

Police applied for a warrant to search Cannon's residence after the surveillance, relying in part on the tipsters' information and in part on the officer's

---

[52] 2007 WL 1849022.
[53] 947 A.2d 1103.
[54] 207 A.3d 566.
[55] *Cannon*, 2007 WL 1849022, at *1.
[56] *Id.*, at *2.

statement that drug dealers only carry what they need for a sale and keep "the other drugs at a secured location, including but not limited [to] their residence."[57]

The court found that the affidavit did not show the informants' past proven reliability and there was no indication that "Cannon was using his residence to deal drugs or to store drugs, drug paraphernalia, or any other evidence of drug transactions."[58] The police investigation was also found to be lacking, as there were no controlled buys and no evidence of Cannon leaving or entering his residence with a bag or anything else that would suggest he was bringing contraband to or from his home.[59] The court invalidated the search, finding that absent "additional factual information giving rise to a probability that evidence would be found in Cannon's home, it was unreasonable for the issuing magistrate to accept the affidavit's content as supporting the evidentiary nexus necessary for a search of [Cannon's home]."[60]

In *LeGrande*, the probable cause affidavit was found to be insufficient because it did not contain any corroborating information to establish the reliability of the tipster's assertion of illegality and police only corroborated the defendant's identity, the location of his locked apartment, his probationary status, and that his neighbor was wanted.[61] Thus, the affidavit "did not show that the tipster had

---

[57] *Id.*
[58] *Id.*, at *5 (citations omitted).
[59] *Id.*
[60] *Id.*
[61] *LeGrande*, 947 A.2d at 1111.

16

knowledge of concealed criminal activity."[62]  Because there was no corroboration by independent police investigation, the totality of the circumstances did not provide a substantial basis to conclude there was probable cause that evidence of a crime would be found in the apartment.[63]

In *Valentine*, the search warrant was found to be insufficient to support a finding of probable cause.  The affidavit was conclusory, merely stating that the informant was past-proven reliable.  The affidavit it did not identify the source of the informant's information or how fresh or stale it was, nor did the affidavit provide self-validating details.  Moreover, there were no other indicia of reliability as surveillance of Valentine (which included Valentine exchanging a duffle bag with another individual), Valentine's prior criminal history (including his recent arrest for gun possession), and an altercation with a neighbor, did not corroborate the informant's tips.  Thus, the affidavit was insufficient to support the magistrate's probable cause finding.[64]

## VI.  CONCLUSION

Where, as here, "the police are acting on the basis of an unidentified informant's tip whose past performance as an informant and basis of knowledge of the subject matter of the current tip are not set forth in the affidavit and where the

---

[62] *Id.* (cleaned up and internal quotations omitted).
[63] *Id.*
[64] *Valentine*, 207 A.3d at 574-75.

17

tip is devoid of detail and not corroborated in any meaningful way, a conclusion that there was probable cause for a search warrant is not reasonable."[65]  Clifton has carried her burden of proof and therefore, the Motion is GRANTED.

       **IT IS SO ORDERED.**

 

 

*/s/Kathleen M. Miller*
Judge Kathleen M. Miller

---

[65] *Id.* at 577.